UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CRAIG TAPKE, | : | Case No. 1:09-cv-77 |
| | : | |
| Petitioner, | : | Judge Timothy S. Black |
| | : | Magistrate Judge Michael R. Merz |
| vs. | : | |
| | : | |
| TIM BRUNSMAN, Warden, | : | |
| Lebanon Correctional Institution, | : | |
| | : | |
| Respondent. | : | |

**DECISION AND ENTRY:
(1)  ADOPTING THE REPORTS AND RECOMMENDATIONS OF THE MAGISTRATE JUDGE (Docs. 34, 39);
(2) OVERRULING PETITIONER'S OBJECTIONS (Docs. 37, 42);
(3)  DENYING AND DISMISSING PETITIONER'S PETITION (Doc. 1);
AND  (4) MAKING NO FINDING AT THIS TIME CONCERNING ISSUANCE OF A CERTIFICATE OF APPEALABILITY OR LEAVE TO APPEAL IN FORMA PAUPERIS**

Petitioner Craig Tapke filed a Petition for a Writ of Habeas Corpus (Doc. 1) pursuant to 28 U.S.C. § 2254.  In state criminal proceedings, a jury found Petitioner guilty "of the rape of a child under the age of ten, the rape of a child under the age of 13, and two counts of gross sexual imposition of a child under the age of 13."  *State v. Tapke*, No. C-060494, 2007 WL 2812310, *1 (Ohio App. Sept. 28, 2007).

Pursuant to the Court's Order of General Reference, this case was referred to United States Magistrate Judge Michael R. Merz, who reviewed the record and filed a Report and Recommendations recommending that the Petition be dismissed with prejudice.  (Doc. 34). Petitioner subsequently filed Objections to the Report and Recommendations.  (Doc.37). The Magistrate Judge filed a Supplemental Report and Recommendations.  (Doc. 39).

1

Petitioner filed Objections to the Supplemental Report and Recommendations. (Doc. 42). The issues presented are ripe for decision by the Court.

## I. BACKGROUND

The state of Ohio indicted Petitioner on five counts alleging sex offenses against D.S., the minor daughter of Petitioner's former girlfriend. In March 2005, when Petitioner no longer lived with the girlfriend or D.S., D.S. told her mother that Petitioner raped and molested her for years, beginning around the time D.S. was seven years old. On March 20, 2005, the day after D.S. informed her mother of the abuse, D.S.'s mother called police about the abuse and was directed to take D.S. to Cincinnati Children's Hospital.

At the hospital on March 20, 2005, D.S. was interviewed by social worker Laura Monhollen and was later examined by a physician. The next day, D.S. was again interviewed by Monhollen at the Mayerson Center at Children's Hospital. As noted by the Ohio court of appeals, the Mayerson Center is "a unit that specializes in caring for child-sex-abuse victims." *Tapke*, 2007 2812310 at *1. Monhollen created separate reports summarizing each of her interviews with D.S. Both reports recorded D.S.'s statement that, approximately six months prior to the interviews, D.S. stayed overnight with Petitioner and that Petitioner "put his hands in her privates" or that Petitioner "put his finders in her crotch" during that overnight stay. (Doc. 44, PAGEID 1311, 1314).

Several days after Monhollen interviewed D.S. at the Mayerson Center, law enforcement questioned Petitioner, at which time Petitioner:

> confessed that on November 20, 2004, D.S. and his daughter had
> visited him at his residence. During the afternoon, [Petitioner] had
> agreed to take a nap with D.S. [Petitioner] stated that they had gone
> upstairs to his room and lain down on his bed, and that then he had put
> his hand on her belly region. [Petitioner] said that [D.S.] had scooted

2

> up so that his hand had gone down her pants and touched her "privates." [Petitioner] said that "privates" meant vagina. [Petitioner] also said that [D.S.] had touched his penis. [Petitioner] admitted to having an erection. [Petitioner] then stated that he went to the bathroom and put on a condom because he was afraid that his body fluids would get on D.S. [Petitioner] said that he lay back down on the bed but became uncomfortable and left. [Petitioner] denied any penetration.

*Tapke*, 2007 WL 2812310 at *2.

The state indicted Petitioner on five counts: (1) rape in violation of Ohio Rev. Code § 2907.02(A)(1)(b) for conduct occurring between January 2000 through March 2003; (2) rape in violation of Ohio Rev. Code § 2907.02(A)(1)(b) for conduct occurring on or about August 7, 2003; (3) rape in violation of Ohio Rev. Code § 2907.02(A)(1)(b) for conduct occurring on or about November 20, 2004; (4) gross sexual imposition in violation of Ohio Rev. Code § 2907.05(A)(4) for sexual contact occurring on or about November 20, 2004; and (5) gross sexual imposition in violation of Ohio Rev. Code § 2907.05(A)(4) for sexual contact occurring on or about November 20, 2004. (Doc. 8-1, PAGEID 93-96).

At trial, the prosecution played an audio recording of Petitioner's confession for the jury. (Doc. 9-6). In addition, D.S. testified about sexual abuse she suffered from Petitioner during the time Petitioner lived with her and her mother before March 2003. (Doc. 9-3, PAGEID 625-633). D.S. also testified concerning an alleged rape by Petitioner that occurred on or about August 7, 2003. (*Id.* at PAGEID 634-637). However, D.S. was unable to recount the details regarding the alleged rape or sexual contact by Petitioner on or about November 20, 2004. (Doc. 9-3, PAGEID 638).

When D.S. could not recall events occurring on or about November 20, 2004, the state prosecutor attempted to refresh D.S.'s recollection by giving D.S. the opportunity to

3

review documents from Children's Hospital, including Monhollen's reports summarizing D.S.'s purported statements made during interviews on March 20, 2005 and March 21, 2005. (*Id*.; *see also* Doc. 44). After being asked to review a particular paragraph within the records from Children's Hospital,[1] D.S.'s memory was not refreshed and D.S. again testified that she could not remember whether Petitioner touched her on or about November 20, 2004. (*Id*. at PAGEID 638-640).

Later during trial, Dr. Robert Shapiro, the director of the Mayerson Center, testified and authenticated D.S.'s medical records from Children's Hospital and the Mayerson Center (*Id*. at 736-738), including Monhollen's reports summarizing her interviews of D.S. on March 20, 2005 and March 21, 2005. (Doc. 44). At the close of the state's case, the court admitted D.S.'s medical records into substantive evidence over the general objection of defense counsel. (Doc. 9-3 at PAGEID 425). While D.S. testified at trial, Monhollen did not testify and was never cross-examined by Petitioner.

At the conclusion of trial, the jury found Petitioner guilty on counts one, three, four and five. The jury acquitted Petitioner on count two that charged Petitioner with rape that allegedly occurred on or about August 7, 2003. Petitioner filed a direct appeal to the Ohio First District Court of Appeals, which affirmed the convictions. *Tapke*, 2007 WL 2812310 at \*17. The Supreme Court of Ohio did not accept Petitioner's appeal for review by order dated February 8, 2008. *State v. Tapke*, 116 Ohio St.3d 1509, 880 N.E.2d 484 (2008).

On February 2, 2009, Petitioner filed a Petition for Writ of Habeas Corpus in this Court setting forth six purported grounds for relief. (Doc. 1). Respondent filed a Return of

---

[1] The record is unclear regarding the specific paragraph D.S. was specifically requested to review to refresh her recollection.

Writ. (Doc. 8). Petitioner then filed a Traverse in Support of Petition for Writ of Habeas Corpus. (Doc. 21). The Magistrate Judge recommends that Petitioner's Petition be denied and dismissed in its entirety. (Docs. 34, 39).

## II.  STANDARD OF REVIEW

Pursuant to 29 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), the Court reviews the comprehensive findings of the Magistrate Judge and considers the record de novo. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that district courts "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). An application challenging claims "adjudicated on the merits in State court" will not be granted unless the State court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1).

A legal principle is "clearly established" for purposes of habeas corpus review "only when it is embodied in a holding of [the Supreme] Court." *Thaler v. Haynes*, 559 U.S. 43 (2010) (citations omitted). "[T]he relevant decision for purposes of determining 'clearly established Federal law' is the last state court decision that adjudicated the claim on the merits." *Miller v. Colson*, 694 F.3d 691, 696 (6th Cir. 2012) (citing *Greene v. Fisher*, --- U.S. ---, 132 S.Ct. 38, 44–45, 181 L.Ed.2d 336 (2011)).

In addition, the "contrary to" and "unreasonable application" clauses set forth in 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). The "contrary to clause" applies when a "state court applies a rule different from the

governing law set forth" by the Supreme Court of the United States or if the state court "decides a case differently . . . on a set of materially indistinguishable facts" as those presented to the Supreme Court. *Id.* (citing *Williams*, 529 U.S. at 405-06). The "unreasonable application" clause applies where "the state court correctly identifies the governing legal principle" set forth by the Supreme Court, "but unreasonably applies it to the facts of the particular case." *Id.* (citing *Williams*, 529 U.S. 407-08). In determining whether a state court's decision unreasonably applied clearly established law, federal courts must focus "on whether the state court's application of clearly established federal law is objectively unreasonable[.]" *Id.* "[A]n unreasonable application is different from an incorrect one." *Id.* at 694 (citation omitted).

### III. ANALYSIS

In his Petition, Petitioner sets forth six grounds for relief. (Doc. 1). The Magistrate Judge recommends that Grounds One, Five, and Six of the Petition be denied as having been procedurally defaulted, while recommending that Grounds Two, Three, and Seven be denied on the merits. Petitioner objects to each of these findings. Having thoroughly reviewed the Magistrate Judge's findings and Petitioner's Objections, the Court **ADOPTS** the Magistrate Judge's findings as they relate to Grounds One, Two, Three, Five, Six, and Seven, **OVERRULES** Petitioner's Objections as they relate to those Grounds, and denies Petitioner's Petition as it relates to these grounds.

Ground Four of the Petition asserts that Petitioner was denied his Sixth Amendment right to confront the witnesses when the trial court admitted records from Children's Hospital and the Mayerson Center, including reports from social worker Monhollen, in the absence of Monhollen being called to testify. Petitioner raised the issue concerning admission of

Monhollen's reports on direct appeal. *Tapke*, 2007 WL 2812310 at *11. Petitioner argued that "the medical records contained testimonial statements made by the social worker and that these statements were admitted into evidence in violation of his constitutional rights under the Confrontation Clause, as the social worker did not testify at trial and [Petitioner] did not have a prior opportunity to cross-examine her." *Id*.

The court of appeals found no merit to Petitioner's contention. The court of appeals first concluded that D.S., not Monhollen, was the applicable declarant for *Crawford* purposes because "[a]lmost each sentence of the report begins with the words 'Patient states * * *.'" *Id*. The court also concluded that D.S.'s statements were not testimonial because the primary purpose of Monhollen's unit "was the care of its patients[,]" and because D.S.'s "statements made in the course of that care could not have objectively been believed to be for trial[.]" *Id*. at 12. Nevertheless, the court of appeals noted that "[e]ven assuming arguendo that [D.S.'s] statements were testimonial," no constitutional violation occurred because "D.S. was called to testify at trial[.]" *Id*.

Petitioner argues that the state court's decision was contrary to the Confrontation Clause of the Sixth Amendment, which provides that: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This provision bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

In *Crawford*, the Supreme Court of the United States noted that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." *Crawford*,

7

541 U.S. at 50. Thus, "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id*. at 68. While the Supreme Court in *Crawford* declined "to spell out a comprehensive definition of 'testimonial'" statements, it did find that testimonial evidence includes, "at a minimum . . . police interrogations." *Id*.

Following *Crawford*, and based on the precedent set forth therein, the Eighth Circuit concluded that statements of a child abuse victim made to a "forensic interviewer" before an emergency room exam were testimonial. *United States v. Bordeaux*, 400 F.3d 548, 555-56 (8th Cir. 2005). In *Bordeaux*:

> After the allegations of sexual abuse arose, government officials referred [the victim] to a center for child evaluation. At this center, [the victim] was interviewed by a forensic interviewer before being examined by a doctor. Consistent with the center's standard operating procedure, the interview was videotaped: as was the custom, two copies of the videotape were made—one for the patient's medical records and one for law enforcement officials.

*Id*. at 555. In concluding that the child's statements were testimonial, the court noted a number of factors, including "[t]he formality of the questioning and the government involvement in it[.]" *Id*. at 556. Further, while "[t]he purpose of the interview (and by extension, the purpose of the statements) [was] disputed," the Court found that:

> the evidence require[d] the conclusion that the purpose was to collect information for law enforcement. First, as a matter of course, the center made one copy of the videotape of this kind of interview for use by law enforcement. Second, at trial, the prosecutor repeatedly referred to the interview as a "forensic" interview, meaning that it "pertain[ed] to, [was] connected with, or [was to be] used in courts of law." Oxford English Dictionary Online Edition (taken from second print ed.1989). That [the child victim's] statements may have also had a medical purpose does not change the fact that they were testimonial, because *Crawford* does not indicate, and logic does not dictate, that multi-purpose statements cannot be testimonial.

8

*Id*.

Subsequently, the Eighth Circuit distinguished *Bordeaux* from the circumstances where a child victim "was taken to [a pediatrician] by his foster parents for a medical examination after they noticed 'some marks on his body.'" *United States v. Peneaux*, 432 F.3d 882, 896 (8th Cir. 2005). There, the child's statements to the pediatrician were not testimonial because the pediatrician did not conduct a forensic interview. *Id*. In addition, the interview conducted by the pediatrician "was for the purpose of ensuring [the victim's] health and protection, and . . . the interview [did not result] in any referral to law enforcement." *Id*. In other words, "[t]he interview lacked the 'formality of . . . questioning,' the substantial 'government involvement,' and 'the law enforcement purpose' present in *Bordeaux*." *Id*. In *Peneaux*, the court concluded that, "[w]here statements are made to a physician seeking to give medical aid in the form of diagnosis or treatment, they are presumptively nontestimonial." *Id*. (citations omitted).

In 2006, in *Davis v. Washington*, 547 U.S. 813, 821 (2006), the Supreme Court of the United States clarified the definition of testimonial, stating that:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 821. Following *Davis*, the Eighth Circuit again considered the issue of testimonial evidence in the context of a child victim's out-of-court statements concerning abuse. *Bobadilla v. Carlson*, 575 F.3d 785 (8th Cir. 2009).

In *Bobadilla*, the family of a minor victim took the minor child to an emergency room after the child described an instance of sex abuse occurring within the days before the emergency room visit. *Id*. at 787. Five days after the emergency room visit, the investigating law enforcement officer sought to interview the victim and contacted a social worker to assist with the interview. *Id*. at 787-88. The interview occurred at the police department in "a room specifically designed to make children comfortable while being questioned about allegations of sexual abuse." *Id*. at 788. The social worker interviewed the minor while the investigating officer was present in the room and observing. *Id*. In addition, the interview was recorded by "[a] camera hidden behind a one-way mirror[.]" *Id*. Finally, the social worker utilized "a 'forensic' technique" to interview the child. *Id*.

In concluding that the statements made by the victim were testimonial, the Eighth Circuit found that the state courts unreasonably applied Crawford, and explained:

> The only significant difference between the interview involved in the present case and the one held to be testimonial in *Crawford* is instead of a police officer asking questions about a suspected criminal violation, he sat silent while a social worker did the same. We find this to be a distinction without a difference. In addition to the aforementioned facts, the interview took place at police headquarters in a room specifically designed for the interrogation of children who allege sexual abuse. Furthermore, under the statute, the interview was recorded for the sole purpose of eliminating the need for [the victim] to be interviewed by law enforcement personnel. [The social worker] also utilized a structured, "forensic" method of interrogating [the victim]. Notably, *Crawford* identified a "recorded statement, knowingly given in response to structured police questioning," as qualifying under any conceivable definition of interrogation. 541 U.S. at 53 n. 4, 124 S.Ct. 1354. In sum, Justice Page was correct to conclude [the social worker] was simply acting as a "surrogate interviewer" for the police. [*State v. Bobadilla*, 709 N.W.2d 243, 258 (Minn. 2006)], (Page, J., dissenting).

10

> [The social worker] was contacted by a police officer to assist with the criminal investigation, the interview took place several days after the abuse allegedly occurred, the interview was conducted at police headquarters with a police officer present, and [the social worker] utilized a structured method of questioning to elicit [the victim's] statements.  As such, it was unreasonable for the Minnesota Supreme Court to conclude, even though the questioning was undertaken by a social worker, the statements made by [the victim] during his interrogation were in any way different than the statements found to be testimonial in *Crawford*.
>
> We, like the district court, are unpersuaded by the existence of Minnesota Statute § 626.556.  While it is true the statute authorizes social workers to interview alleged victims of abuse for the purpose of protecting their health and welfare, the circumstances of the present case, as described above, indicate such was not the purpose of [the minor's] interview.  Contrary to the Minnesota Supreme Court's assertion, this interview was not conducted "for the overriding purpose of assessing whether abuse occurred, and whether steps were therefore needed to protect the health and welfare of the child." *Id*. at 255.  [The social worker's] testimony makes clear she decided to interview [the victim] only after [the investigating officer] asked her to assist him with the criminal investigation.  The interview being conducted five days after the alleged abuse is a further indication of its purpose, which was to elicit information for use at trial, rather than determining whether steps were needed to protect [the victim] immediate health and welfare.  Furthermore, given the alleged abuse was reported promptly and [the victim's] parents voluntarily cooperated with the investigation, there is no evidence [the victim's] health or welfare was in further danger.  Additionally, the district court did not clearly err in finding [the social worker] did not ask the type of questions one would reasonably expect if the purpose of the interview was to assess "imminent" risks to [the victim's] health and welfare, such as whether he had recently seen [the defendant] or whether he was spending any time at his grandmother's house [where the incident occurred].  Instead, the interview consisted of highly structured questioning aimed at getting [the victim] to repeat, on videotape, his allegation of abuse.

*Bobadilla*, 575 F.3d at 791-92.

Here, while the circumstances surrounding the March 20, 2005 interview of D.S. in the emergency room are substantially similar to the circumstances present in

11

*Bordeaux*,[2] and the circumstances of the March 21, 2005 interview are similar to the circumstances in *Bobadilla*,[3] even if the Court concluded that D.S.'s statements to Monhollen are testimonial and that Monhollen's subsequent statements summarizing D.S.'s statements are testimonial,[4] the state court's conclusion that D.S. is the applicable declarant for Confrontation Clause purposes is not an objectively unreasonable application of clearly

---

[2] On March 20, 2005, D.S. went to the emergency room only after her mother was instructed to do so by police. (Doc. 44, PAGEID 1310; Doc. 9-3, PAGEID 644, 677). In the emergency room, D.S. met with Monhollen before undergoing a physical examination, at which time D.S. gave an account regarding the history of abuse, including a statement that Petitioner "put his hands in her privates" approximately six months before the interview. (Doc. 44, PAGEID 1308, 1310-11). Importantly, Monhollen is a forensic interviewer, as evidenced by her March 21, 2005 report. (Doc. 44, PAGEID 1314).

[3] Monhollen interviewed D.S. a second time on March 21, 2005 at the Mayerson Center and, thereafter, Monhollen authored a second report summarizing the second interview. This second report was also admitted as substantive evidence at Petitioner's trial. (Doc. 44, PAGEID 1314). The interview on March 21, 2005 was a "[p]re-scheduled[,]" "[f]orensic evaluation" that was video recorded and personally observed by a law enforcement officer. (*Id.*; see also Doc. 9-4, PAGEID 943-944). Detective Bryan Peak, who later viewed the interview tape recording, specifically described the interview as a "forensic interview." (Doc. 9-3, PAGEID 687).

[4] Certainly, from Monhollen's perspective, there is little doubt that her report summarizing D.S.'s statements were for the primary purpose of providing such information to law enforcement. Dr. Shapiro confirmed that the forms completed by Monhollen "are specifically used for the purpose of reporting concerns of child abuse and neglect." (Doc. 9-3, PAGEID 738). While Dr. Shapiro did testify that the records are kept in a child victim's chart and that the information is used in the process of providing diagnosis and treatment, "[t]hat [the child victim's] statements may have also had a medical purpose does not change the fact that they were testimonial, because Crawford does not indicate, and logic does not dictate, that multi-purpose statements cannot be testimonial." *Bordeaux*, 400 F.3d at 556.

Even in the absence of Dr. Shapiro's specific testimony in this regard, the face of the form completed by Monhollen on March 20, 2005 confirms that her summary was prepared "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" *Crawford*, 541 U.S. at 52. Both interview summaries prepared by Monhollen are written on a form specifically noting Ohio Rev. Code § 2151.421. (Doc. 44, PAGEID 1310). Specifically, "R.C. 2151.421(A)(1)(a) imposes an affirmative legal duty upon physicians and nurses to report known or suspected child abuse" and "[i]t does not merely permit such persons to report known or suspected abuse." *Casbohm v. MetroHealth Med. Ctr.*, 140 Ohio App.3d 58, 746 N.E.2d 661, 665 (Ohio App. 2000). The top of the form completed by Monhollen concerning the March 20, 2005 interview specifically requests the "[a]lleged perpetrator's name," "[a]ddress where assault occurred," and the names of law enforcement officers to whom the report should be sent. (Doc. 44, PAGEID 1310). The bottom of the form requests the name and district of the applicable police department, the name of the applicable child protection service agency or department of jobs and family services, and, finally, the form has a check-box to confirm that the report was also placed in the victim's hospital chart. (*Id.*) Based on the foregoing, the Court would conclude that Monhollen's statements summarizing D.S.'s interviews are testimonial.

12

established federal law.  This Court has identified only a single case concluding, in a footnote, that in the case of double hearsay, "both [declarants] need to be examined for Confrontation Clause purposes." *United States v. McKinney*, 707 F.2d 381, 383 n2 (9th Cir. 1983).  Here, D.S., the original declarant, testified at trial and was available for cross-examination.  Although D.S. could not remember what happened on or about November 24, 2005, Petitioner asserts no constitutional violation arising from D.S.'s lack of memory.[5]

## IV.  CONCLUSION

Accordingly, based on the foregoing, the Court: (1) **ADOPTS** the Reports and Recommendations of the Magistrate Judge; (2)  **OVERRULES** Petitioner's Objections; (3)  **DENIES AND DISMISSES** Petitioner's Petition; and (4) makes no finding at this time concerning issuance of a certificate of appealability under 28 U.S.C. § 2253(c) and leave to appeal in forma pauperis pending separate motion by Petitioner.

**IT IS SO ORDERED.**

*Date:  3/29/13*                                                                 *s/ Timothy S. Black*
                                                                                 Timothy S. Black
                                                                                 United States District Judge

---

[5] The Supreme Court of the United States "has never held that a Confrontation Clause violation can be founded upon a witness' loss of memory[.]" *United States v. Owens*, 484 U.S. 554, 557 (1988).  Instead, "the Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Id*. at 559 (emphasis in original) (citations omitted).  In *Owens*, the Supreme Court stated that "[i]t is sufficient that the defendant has the opportunity to bring out such matters as . . . the very fact that [the witness] has a bad memory[,]" noting that establishing the witness' bad memory "is often a prime objective of cross-examination[.]" *Id*. (internal citation omitted).